SUPREME COURT. Monroe General Term, March, 1860. *Smith, Johnson* and *Knox,* Justices.

## WILLIAM S. COATS, plaintiff in error, *v.* THE PEOPLE, defendants in error.

Form of a writ of error, sued out by the defendant, to remove a cause, after conviction, from the Court of Sessions to the Supreme Court, with the allowance of the same and stay of proceedings on the sentence.

Form of an indictment against husband and wife for the embezzlement and larceny of property charged to belong to A. C., as Superintendent of the Poor of the county.

An indictment for embezzlement and larceny was found against W. S. C. and M. C., his wife, and, on motion in behalf of M. C., the court quashed the indictment as to her: *Held,* that quashing the indictment as to M. C. did not discharge it, and was no reason for quashing it as to W. S. C., but that he could be tried under the indictment as *if originally indicted alone.*

It is no reason for quashing an indictment for the embezzlement and larceny of articles of food provided for the support of a county poor house, that they are charged in the indictment as the property of the Superintendent of the Poor of the county.

When the keeper of a county poor house, employed for that purpose by the Superintendent of the Poor of the county, and holding uuder him, secretly sold and converted to his own use articles of food provided for the support of the county poor house: *Held,* that he was guilty of embezzlement within the statute (2 *R. S.,* 678), and could be convicted of that offence under au indictment charging that the articles embezzled were the property of such Superintendent of the Poor.

Counts for embezzlement and larceny may be joined in the same indictment.

It is no objection to a count for embezzlement, that it charges the embezzling of several different articles, some of them of more, and some of them of less value than $25 each.

Where, on the cross-examination of a witness, he was asked whether he had not been convicted of petit larceny, and whether he had not been in jail under sentence on a criminal charge, and, on objection made by the opposite counsel, the evidence was excluded as being immaterial, and at a later stage of the trial the witness was recalled, and all objections to the questions were withdrawn, and an opportunity was given for a full examination: *Held,* that no rror had been committed which would warrant a reversal of the judgment.

On the trial of an indictment for embezzlement, it is competent to prove by the employer, that he never gave any authority to the defendant to do the acts complained of, and that the defendant has never accounted or reported to him

for the property charged to have been embezzled; and such evidence may be given before the proving of the secreting or converting to his own use, by the defendant, of the property in question.

It is not competent, on the trial of such an indictment, for the defendant to prove that he reported promptly to his employer another transaction, not connected with the acts complained of, and of a different character.

Though the testimony of an accomplice should be received with great caution, yet a conviction may be had on the uncorroborated testimony of an accomplice, if the jury are fully satisfied of its truth.

It is not' error for a court to refuse to charge, in a criminal case, that "proof of previous good character of the accused is a sufficient defence in a doubtful case."

THIS case came into this court on writ of error to the Court of Sessions of Yates county. The writ, with the allowance and stay of proceedings, were as follows:

The People of the State of New York, by the grace of God free and independent, to the County Judge and [L. S.] Justices composing the Court of Sessions in and for the county of Yates, Greeting:

Because, in the record and proceedings, and also in the giving of judgment on a certain bill of indictment which was in our said Court of Sessions before you, against William S. Coats, indicted with Matilda Coats, for the crime of embezzlement, manifest error hath intervened to the great injury of the said William S. Coats, as by his complaint we are informed: We being willing that the error, if any there be, should in due manner be corrected, and full and speedy justice done in the premises between us and the said William S. Coats, in this behalf, do command you, that if judgment be thereupon given, then you send to our justices of our Supreme Court for the seventh district, distinctly and openly under your seal, the record and proceedings upon the indictment aforesaid, with the bill of exceptions therein, and with all things concerning the same, and this writ, so that they may have them at the Court House in the city of Rochester, on the first Monday of March next, that the record and proceedings aforesaid being inspected, we may cause to be further done thereupon, for correcting that

error, what of right and according to the law and custom of the State of New York ought to be done.

Witness, E. Darwin Smith, one of the Justices of our Supreme Court, at the Court House in the city of Rochester, the 20th day of February, in the year 1860.

DYER D. S. BROWN, *Clerk.*

JOHN L. LEWIS, Jr., *Attorney.*

Indorsed as follows:

I do hereby allow the within writ of error, and do further order and expressly direct that the said writ of error and this allowance thereof do operate as a stay of proceedings on the judgment upon which such writ of error is brought; and the sheriff of the county of Yates is therefore hereby ordered to stay the execution of the sentence pronounced against the said William S. Coats, until the further order of the Supreme Court on this writ of error.

HENRY WELLES.

Dated February 20, 1860

It appeared by the return that an indictment for embezzlement and larceny had been found as follows:

*State of New York, Yates County, ss:*

The Jurors of the People of the State of New York, and for the body of the county of Yates aforesaid, upon their oath, do present:

That William S. Coats, of the town of Jerusalem, in the county of Yates, and Matilda Coats, wife of the said William S. Coats, of the town of Jerusalem, in the said county of Yates, on the twenty-eighth day of December, in the year of our Lord one thousand eight hundred and fifty-six, at the town of Jerusalem, in the county of Yates, were agents to Adam Clark, as the Superintendent of the Poor of the county of Yates, and keepers of the County Poor House in and for the county of Yates, employed as such by and under the said

Coats *v.* The People.

Adam Clark, as such Superintendent as aforesaid, and employed and entrusted as such agents and keepers by the said Adam Clark, as such Superintendent as aforesaid, to receive and take charge for him, the said Adam Clark, as such Superintendent of the Poor of the county of Yates, of goods, chattels and personal property, pork, hams, butter, beef, meat, fowls, wool, knives and forks, crockery, sugar, coffee, cattle and other stock, provisions, groceries, household articles and furniture, wheat and other grain and farm produce, and farm stock. And being then and there such agents and keepers so employed and trusted as aforesaid, the said William S. Coats and the said Matilda Coats, by virtue of such employment and entrustment, did then and there receive and take into their possession, for and on account of the said Adam Clark, as such Superintendent of the Poor of the county of Yates, their said principal and employer, one barrel of lard, of the value of sixty dollars; three hundred pounds of lard of the value of sixty dollars; two half firkins of butter, of the value of twenty-five dollars; eighty chickens, of the value of twelve dollars; thirty ducks, of the value of six dollars; twelve turkeys, of the value of four dollars; one hundred and fifty fowls, of the value of twenty dollars; eighty pounds of butter, of the value of sixteen dollars; one thousand pounds of pork, of the value of one hundred dollars; three hundred and fifty pounds of pork in the hog, of the value of twenty-five dollars; eight hundred and twenty pounds of pork hams, smoked, of the value of eighty two dollars [here followed a list of many more articles which it is unnecessary to repeat], belonging to the said Superintendent of the Poor of the county of Yates; and having so received and taken into their possession the said one barrel of lard, three hundred pounds of lard, two half firkins of butter, eighty chickens, thirty ducks, twelve turkeys, one hundred aud fifty fowls, eighty pounds of butter, one thousand pounds of pork, and the said other goods, chattels, personal property and effects aforesaid, for and on account of their said employer and principal, afterwards, to wit: On the day, in the year aforesaid, at the town, in the county aforesaid, they, the said

Coats *v.* The People.

William S. Coats and Matilda Coats, then and there, with force and arms, without the assent of the same Adam Clark, as Superintendent, as aforesaid, their said employer and principal, the same goods, chattels, personal property and effects aforesaid, so intrusted to them as aforesaid, did unlawfully, fraudulently and feloniously take, embezzle, carry away and convert to their own use, contrary to the trust and confidence reposed in them, the said William S. Coats and Matilda Coats, by the said Adam Clark, as such Superintendent of the Poor aforesaid, to the great damage of the said Adam Clark, as such Superintendent of the Poor aforesaid, and other people of the county of Yates, contrary to the form of the statute in such case made and provided, and against the peace of the People of the State of New York, and their dignity.

And the jurors aforesaid, upon their oaths aforesaid, do further present: That the said William S. Coats and Matilda Coats, on the twenty-eighth day of December, in the year of our Lord one thousand eight hundred and fifty-six, at the town of Jerusalem, in the county of Yates, with force and arms, one barrel of lard, of the value of sixty dollars [enumerating the same articles as in the first count], the goods, chattels and personal property of Adam Clark, as Superintendent of the Poor of the county of Yates, then and there being found, then and there feloniously and unlawfully did steal, take and carry away, contrary to the form of the statute in such case made and provided, to the great damage of the said Superintendent of the Poor of the county of Yates, and the people of the county of Yates, and against the peace of the People of the State of New York, and their dignity.

H. M. STEWART, *District Attorney.*

Indorsed, A true bill.

JEREMIAH S. BURTCH, *Foreman.*

William S. Coats pleaded not guilty. On motion, in behalf of Matilda Coats, the following order was entered:

Coats *v.* The People.

YATES SESSIONS.

The People
*v.*
William S. Coats and
Matilda Coats.

May 18, 1857. Indicted jointly for grand larceny and embezzlement.

*Henry M. Stewart,* District Attorney.

*D. J. Sunderlin,* Attorney for defendant.

"MOTION TO QUASH THE INDICTMENT AS AGAINST MATILDA
" COATS.

" After hearing D. J. Sunderlin and others, of counsel for defendant, Matilda Coats, in favor of, and Henry M. Stewart, District Attorney, in opposition thereto, it is ordered that the indictment in this cause be and the same is hereby quashed as to the defendant Matilda Coats."

The cause then proceeded to trial as against William S. Coats, and after the impanneling of the jury, the prisoner's counsel moved the court to quash the indictment, on the following grounds:

1. That it appears by the record that the indictment had been quashed as to Matilda Coats; and that the defendant and the said Matilda Coats, having been jointly indicted, quashing it as to one, quashed it as to both, the indictment being an entire thing.

2. That the property charged to have been embezzled and stolen is erroneously charged to be the property of Adam Clark, Superintendent of the Poor of the county of Yates, when it should have been charged as being in the Board of Supervisors of said county.

3. That the count for embezzlement cannot be sustained, because it alleges that the defendant, William S. Coats, was keeper of the county poor house, and therefore was not the

clerk or servant of any private person, or of any copartnership, or the officer, agent, clerk or servant of any incorporated company; the property alleged to have been embezzled not being charged to be the property of any private person or copartnership, and the Superintendent of the Poor not being an incorporated company; and the count for larceny cannot be sustained, because it alleges that William S. Coats was such keeper, and therefore had lawful possession of the property alleged to be stolen, and could not be guilty of larceny of it; and the indictment failing to charge an offence under the statute, should therefore be quashed.

4. That the office of keeper of the poor house being created by statute, and the superintendent being designated by statute to appoint or employ such keeper, it is only a statute duty, and the relation of principal and agent, master and servant, or clerk, does not exist between them.

5. That the indictment is bad for duplicity and multifariousness in charging different offences of different degrees in the same count and in different counts.

The court denied the motion, to which decision the defendant's counsel excepted.

Upon the trial, the District Attorney introduced *Adam Clark* as a witness, who testified as follows:

I was sole Superintendent of the Poor of Yates county from January 1st, 1856, to January 1st, 1857; I employed the defendant, William S. Coats, as keeper of the poor house in March, 1856; the agreement between us was, that he was to take charge of the poor house and farm, and the paupers that were placed under his care during the year; to furnish all the female hired help during the year; to faithfully perform the duties, and receive $328 for the year; the year commenced on the first day of April, 1856; he was likewise to use his team on the farm what was necessary.

Q. In what capacity was he employed? A. As keeper of the county poor house and farm; he was to give his whole time and attention to the duties of keeper during the year; I think he was to have the privilege of keeping his team; he

Coats *v.* The People.

was to have the board of himself and family at the poor house; he continued to act as keeper from the first of April, 1856, till the 26th or 27th of December following, which is as far as my knowledge extends; during that time he resided with his family at the county poor house in the discharge of his duties as keeper; there were pork hams at the poor house in the spring of 1856; I could not state how many; they were smoked on the premises during the preceding winter and fall; the defendant had charge of all personal property in the poor house and on the premises during the year.

*Q.* Were there any provisions on the premises except those that belonged to the county?

This question was objected to by defendant's counsel, as being irrelevant and immaterial. The court overruled the objection, and decided the question to be proper, to which decision defendant's counsel excepted.

*A.* I do not recollect of any; Mrs. Coats had the privilege of fattening a couple of hogs there; she had also the privilege of keeping a couple of cows, which she claimed; those hams belonged to the county so far as I know.

*Q.* Have you at any time given the defendant, William S. Coats, authority to sell any pork hams from the county poor house or premises? *A.* No further than to sell to the work hands on the place when they wanted provisions; I never gave any consent that he should convert any of them in any manner to his own use, except for purposes of his own table.

*Q.* Has the defendant ever accounted to you, or reported to you for and as to any pork hams sold or by him taken away from the poor house, with the exception you have named?

This question was objected to by defendant's counsel, as irrelevant and improper, because there is no evidence that defendant had sold or taken away any hams from the poor house. The court overruled the objection, and decided the question to be proper, to which decision defendant's counsel then and there excepted.

*A.* He has not; he has never informed me in any manner that he has so sold pork hams; my term of office commenced

1st January, 1854, and I acted for three years; the first year I had two associates; in 1855 I had one associate, and in 1856 I was alone.

*John Daines* was then sworn for the People, and testified: In the spring and summer of 1856, I worked at the poor house; William S. Coats and Adam Clark both employed me; I was at work by the month on the poor house farm; I .boarded there; my term of work commenced there the first of April, and I worked there till late in the fall; I worked under the direction of defendant; I do not know how many pork hams were cured at the poor house in the winter and spring of 1856; they were smoked in the smoke house; after they were smoked they were carried out of the smoke house into the cellar; I should think there were over one hundred hams and shoulders; a number were removed up into the garret the last of April or first of May; I think I took forty up; they were taken up there by the direction of defendant and his wife; the garret was in the upper part of the main building, up three pair of stairs, called the north garret; I took those hams to Geneva about the first of June with the county team; one of them was a grey horse, and the other a sorrel, with a.strip in his forehead; the grey horse had been on the farm three or four years; the sorrel was bought by defendant and Moses W. Eastman, a former superintendent for the county; the wagon was a lightish kind of a lumber wagon, and belonged to the county; I took the hams to Geneva by the direction of defendant and another person; a day or two before I went, defendant told me it was good weather, and he wanted I should go with the hams; he wanted me to start early; this may have been the day before; the time was then fixed for me to go; we loaded them in the neighborhood of midnight; defendant assisted me; they were brought down out of the garret, and put into the wagon at the front door, and we both loaded them when we brought them down; the load consisted of hams, dried beef and tongues, and a half firkin of butter; I do not remember that there were any shoulders; the number of hams was forty; there were about one hundred pounds of dried beef

and six or seven tongues; there was no mark on the hams; defendant told me to take the hams to Geneva and sell them, and get what I could for them; I do not recollect what he told me to do with the money; he told me to start early; I started in the neighborhood of two o'clock in the morning; I got into Geneva in the neighborhood of nine o'clock in the morning; I sold my load to different persons, but the heft of it I sold to George C. P. Teal; I sold part before I sold to him; but I do not know how many, nor to whom I sold them; Mr. Teal's place of business is on Water street, on the west side, near the depot; James D. Page advised me to go to him; I sold Mr. Teal some hams and dried beef; I sold him the balance of the load; I do not recollect how many pounds of ham there were; I sold to him at nine cents a pound all around, and threw the tongues in; he paid me in the neighborhood of forty-five dollars; I then went to the hotel and fed my horses; I got back to the poor house about sundown; I gave the money I received to Mrs. Coats; defendant and she was in the room together when I went in; took out a paper that I had with the figures on it of the sale; I gave defendant the paper, and I gave Mrs. Coats the money; she said she would be banker, or something like that; I saw Mr. Page at Mr. Teal's when I was selling to him.

On his *cross-examination*, among other things, the witness was asked the following questions:

*Q.* Have you been convicted of petit larceny since you lived in Jerusalem?

This question was objected to by the District Attorney, on the ground that the highest evidence of such conviction must be produced. The court sustained the objection, and decided the question to be illegal and improper; to which decision the counsel for defendant excepted.

*Q.* How many times have you been in jail in this county?

This question was objected to by the District Attorney, on the ground that it was immaterial. The court sustained the objection and decided the question to be improper and imma-

terial, to which decision the counsel for the defendant excepted.

*Q.* Have you been in jail under sentence on a criminal charge?

This question was objected to by the District Attorney, on the ground that it was immaterial. The court sustained the objection, and decided the question to be immaterial; to which decision the counsel for defendant excepted.

At a later stage of the trial, the counsel for the People re-called this witness, and offered him for further cross-examination by defendant's counsel, and withdrew all objections to the questions put to the witness on his cross-examination, and consented that they might be answered, and the witness fully examined and cross-examined on those points.

*James D. Page* and *George C. P. Teal* were then called as witnesses for the People, and gave evidence tending to corroborate the testimony of Daines, as to his selling the provisions in Geneva at the time testified to by Daines.

*Adam Clark*, recalled for the People, further testified: One of the horses of the county team was a dark grey and the other was a sorrel, with a white strip in the forehead; the county had a common lumber two-horse wagon on the premises; defendant had a light grey horse, that was there a part of the time in 1856; it was said to belong to his wife; he sometimes drove it with one of his span of horses.

On his *cross-examination*, he testified: The wagon was not a light wagon; it was a wagon for heavy draughts; on the 10th or 11th of August, 1856, I was informed that a sleigh load of things had gone from the poor house to Geneva during the preceding winter; I went to the witness, Daines, and inquired of him if he had taken a load to Geneva; he stated that he had taken a couple of shoats that Mrs. Coats had leave to fatten, and some poultry, and that was all that he took; he said nothing about going to Geneva at any other time than this; I remarked to him that if there was any such thing going on I wanted to know it; I spoke to him a number of times about the affairs at the poor house; I generally made the inquiry of

Coats *v.* The People.

him whether matters were managed correctly about the poor house; he always replied that all things were managed right and honestly.

On his *re-examination*, he further testified: One of the conversations I had with Daines was in the presence of Mr. and Mrs. Coats; they all said they knew nothing wrong there.

Evidence was afterwards introduced on the part of the defence, tending to contradict Daines as to the number of hams kept in the garret at the time mentioned by him, and tending also to show that the smoke house at the poor house, where hams were kept, had been broken open in the spring or summer of 1856, and hams taken out.

*Adam Clark*, recalled by defendant, further testified: The defendant made a request to me for leave of absence, to go to Lockport in the forepart of the warm season in 1856; my recollection is that I granted him permission under certain provisions. In the agreement with defendant, his time was to be devoted first to the paupers, and whatever time was over he should devote to the farm; it was not expressed in the agreement that he should labor on the farm; Daines was employed to labor on the farm, and to use the team to haul provisions or anything of that kind.

*Q.* Did defendant, Coats, report to you the fact of the smoke house being broken open the first time you were there after it occurred?

To this question the District Attorney objected, on the ground that the evidence was improper, and the court so decided and sustained the objection; to which decision the counsel for defendant excepted.

I examined the smoke house, but I could not specify the time; my best recollection is, that it was the latter part of spring or forepart of summer; there were some appearances as if they had been trying to pry the door open; there were some dents in the jamb, and some in the door.

*Q.* Did you see enough to satisfy you that the attempts had been successful?

To this question the District Attorney objected, on the ground that it called for the opinion of the witness. The court sustained the objection, and decided the question to be improper; to which decision the counsel for the defendant excepted.

My best recollection is, that the dents were a little below the staple, between that and the bottom of the door; the appearance of the marks could be made in different ways, by prying or throwing something against the door.

On his *cross-examination* he further testified: The conditions upon which I consented that defendant should go to Lockport were, that he should leave suitable persons in charge in his absence; I do not know of my own knowledge that he went; I was at the poor house in June; my best recollection is that defendant was there then; I do not recollect making a personal agreement with Daines; the defendant never reported to me that any hams were missing from the poor house, besides those taken from the smoke house; he said that hams were taken out of the smoke house when it was broken open; I do not recollect the number he stated; my best recollection is that it was somewhere from six to twelve.

It was proved, in the course of the trial, that Daines had been convicted of petit larceny on the 12th May, 1843, before a court of Special Sessions, and punished by imprisonment in the county jail.

Witnesses were introduced to impeach and to sustain the general character of Daines.

Evidence was also given for and against the general good character of the prisoner.

After the evidence was closed, the court charged the jury, among other things, as follows:

To warrant a verdict of guilty, several propositions must be affirmatively established by the People.

1st. It must appear from the proof that Adam Clark was Superintendent of the Poor of the county of Yates, at the time the crime is charged to have been committed, and that as

such superintendent he was an incorporated company, within the meaning of the statute defining the offence.

2d. That the defendant was the agent of Adam Clark, as such superintendent being such incorporated company.

These two propositions involve questions of law which have heretofore been disposed of by this court, and are not to be submitted to you, except as qualified by the court; and that the defendant may have the full benefit of our ruling upon these points, we now advise and instruct you, as a matter of law, that Adam Clark, as Superintendent of the Poor, was an incorporated company within the meaning of the statute, and that if you shall be satisfied from the evidence that the defendant was the keeper of the poor house under Clark, the superintendent, during the year 1856, then he was the agent of an incorporated company, within the meaning of this statute.

The question whether Clark was such superintendent during this period of time, does not seem to be disputed. His testimony upon this point seems to fully sustain the proposition, and we apprehend you will have but little doubt or trouble in determining this question.

The next proposition to be affirmatively established by the People's proof, is this: Has the crime charged in the indictment been committed?

This is strictly the first proposition of fact to be found by you, and doubtless it will not be the laboring one in your minds. It is, however, for you to say whether, under the evidence, this crime has been committed. If you shall find in the affirmative of this proposition, then you will next inquire whether these hams came into the possession of the defendant by virtue of his employment as the agent of Clark, the superintendent.

If the defendant was the keeper of the poor house, and you shall so find, then all such provisions as were furnished by the superintendent for the maintenance of the paupers at the poor house, came into his possession, and in judgment of law were in his custody and under his control; but whether they were thus furnished, is a question of fact for your determina-

tion. If, then, these hams were provided by the superintendent for this purpose, and thereby came into the possession of the defendant as keeper, the question arises, did he afterwards embezzle and convert them to his own use? This, gentlemen, is the real laboring question in the case. John Daines is the principal witness, and without his testimony no conviction can be had. His position was subordinate to that of the defendant; his labors were principally confined to the farm, and that seems to have been the object and purpose for which he was hired. You will remember the testimony upon this point. He says that he spoke to Mr. Clark, the superintendent, about working there, and that Mr. Clark referred him to the defendant, and said that if they agreed he could go to work, and that subsequently he did go to work there. In a legal aspect, I think we must regard the position and relation of Daines as subordinate to that of the defendant, the keeper. The defendant, occupying the position of keeper, had the authority to direct Daines as to his employment on the farm, and all directions given by him within the sphere of his duty, Daines, it would seem, was bound to obey. This seems to have been the manifest intention of the superintendent and keeper when they hired him.

We have said that Daines is the principal witness, and we now say that if he has testified truly, and you are satisfied that he has so testified, then we apprehend you will have but little difficulty in arriving at a satisfactory conclusion; and if, on the contrary, his statements are fabricated, or he is not entitled to credit, then your duty is very plain. You should render a verdict of not guilty.

It is claimed on the part of the defendant, that Daines is an accomplice, and standing in that relation he is not entitled to credit, and should not be believed, unless he is sustained by corroborating circumstances, proving or tending to prove the commission of the offence charged, and we are requested so to charge you. We are not so prepared to charge you, but propose to state to you such principles of law as we think applicable to this question.

Coats *v.* The People.

1st. If John Daines, when he brought those hams down from the garret (assuming that he did so), and put them in the wagon, and took them to Geneva, as stated by him, knew that the defendant was committing a crime, then he was a *particeps criminis*, and ought to be corroborated; but whether he had such knowledge or not, we shall submit to you as a question of fact. If you shall find from the evidence that he did not thus act, then he does not stand in such a relation, and does not require the corroboration stated.

We understand the rule of law, as to the testimony of accomplices, to be this, and we so give the law to you, that while a conviction may be had upon the uncorroborated testimony of an accomplice, if the jury are fully convinced of its truth, yet, at the same time, it is our duty to advise you that the testimony of a person standing in this relation should be received with great caution. Assuming that Daines stands in this relation, it is your duty to examine his testimony with the utmost caution, and unless you are fully convinced that he has been truthful and given a correct statement, you should not render a verdict of guilty.

We have been requested to charge you that the sale of the hams at Geneva, as testified to by the witnesses, Page and Teal, and the circumstances attending that sale, do not corroborate the witness, Daines, as to any material fact establishing or tending to establish the guilt of the defendant; but we feel it to be the safer course to say to you that we cannot so advise you; nor will we advise you that there are such corroborating circumstances as to go to sustain Daines, upon the assumption that he is an accomplice. We prefer to leave the credibility of Daines to you upon the whole case as it appears before you in evidence, with the suggestions we now make.

It is claimed, on the part of the District Attorney, that Daines drove the poor house team to Geneva, and this is a fact which the jury have the right to take into consideration. It must be borne in mind, however, that this is not conceded by the defendant. It becomes, therefore, a question of fact for you to say whether he did drive the poor house team or not.

That he was there with a team, and that he sold hams there, cannot be nor has it been denied. Was it, then, the poor house team? If it was, could he have been absent with it for the length of time stated by him, and the defendant be ignorant of the fact? The defendant was the custodian of the poor house team and property. They were under his direction and control, and whether, assuming that it was the poor house team, the witness, Daines, could probably be absent as stated, without the knowledge of the defendant, is submitted to your consideration. The same is true of the hams. If they were taken from the poor house, were they so taken with or without the knowledge of the defendant? These questions will probably arise in your minds when you retire to your room for deliberation, and are proper to be considered in canvassing the question of the guilt or innocence of the accused.

It is claimed on the part of the prosecution, that Daines has been corroborated by the witness, Jackson. You will remember his testimony as to seeing hams in the garret the last days of May or the first of June. This is certainly a material point in this case, because, if there were no hams there at all during the time stated by Daines, then his story is a fabrication, and he is not entitled to credit; and whether or not there were hams there, it becomes very important for you to inquire. If Jackson is not mistaken as to this, then his testimony does corroborate Daines, in a material point, as to hams being in the garret. In this connection, however, you will consider the testimony of Mrs. Sarah Coats, Mrs. Simmons, Minor Coats, Charles Lawrence and Adam Clark. (The court here called the attention of the jury to the testimony of these witnesses.) We say, then, the testimony of these witnesses is important and material, and as honest and intelligent men you are to pass upon it.

It is claimed, on the part of the defendant's counsel, that Daines is not entitled to credit upon the whole case; that he has not only been contradicted by these witnesses as to the hams being in this room, and in other respects, but that he has been impeached by the testimony of witnesses upon the

Coats *v.* The People.

stand. You have heard the testimony of these witnesses as to the character of Daines, and the whole evidence is before you. You are the sole judges of credibility.      *      *      *

We can only say, in conclusion, as we have stated before, this whole case hinges upon the testimony of John Daines. If he is to be believed, and you have no reasonable doubt as to the truth of his statements, then your duty, though painful, is plain; and if, on the contrary, you do not believe him, or if this testimony fails to convince your judgments of its truth, beyond a reasonable doubt, then your duty is equally plain—you should find a verdict of not guilty. The defendant, though indicted, stands before you with the presumption of innocence in his favor. This presumption must be overcome by proof, and this proof must be of such a character, and make such an impression on your minds, that you have, as we before stated, no reasonable doubt of his guilt. The defendant is entitled to and should have the benefit of all such doubts. The rule in this respect is different from what prevails in civil cases. In the latter, the jury may weigh the proofs, and may place their verdict upon the preponderating scale; but in criminal trials, where the benignity of the law presumes an accused party to be innocent until proved guilty, the evidence should generate a full belief of the facts charged to the exclusion of all reasonable doubt. It should establish the guilt so clearly, that a reasonable supposition of innocence would be wholly inconsistent with it.

The charge of the court being concluded, the counsel for the defendant, in the presence of the jury, took the following several specific exceptions thereto:

To so much of the charge as instructed and advised the jury "that Adam Clark, as Superintendent of the Poor, was an incorporated company within the meaning of the statute, and that if you shall be satisfied from the evidence that the defendant was the keeper of the poor house under Clark, the superintendent, during the year 1856, then he was the agent of an incorporated company, within the meaning of the statute."

And to so much of the charge as instructed and advised the jury concerning the provisions furnished by the superintendent for the maintenance of the paupers, and the possession of the same by the keeper, in these words: "And in judgment of law, were in his custody and under his control."

And to so much of the charge as instructed and advised the jury concerning the same witness, Daines, that "in a legal aspect, I think we must regard the position and relation of Daines as subordinate to that of the defendant, the keeper."

And to so much of the charge as instructed and advised the jury in these words: " The defendant, occupying the position of keeper, had authority to direct Daines as to his employment on the farm, and all directions given by him, within the sphere of his duty, Daines, it would seem, was bound to obey."

And to so much of the charge as instructed and advised the jury in these words:

"1st. If John Daines, when he brought those hams down from the garret (assuming that he did so), and put them into the wagon, and took them to Geneva, as stated by him, knew that the defendant was committing a crime, then he was a *particeps criminis*, and ought to be corroborated; but whether he had such knowledge or not, we shall submit to you as a question of fact. If you shall find from the evidence that he did not thus act, then he does not stand in such a relation, and does not require the corroboration stated." ·

And to so much of the charge as instructed and advised the jury in these words: "We understand the rule of law as to the testimony of accomplices, to be this, and we so give the law to you, that while a conviction may be had upon the uncorroborated testimony of an accomplice, if the jury are fully convinced of its truth, yet, at the same time, it is our duty to advise you that the testimony of a person standing in this relation, should be received with great caution."

The defendant's counsel also requested the said court to charge the jury, amongst other things, as follows:

1. That there can be no conviction of an accused party merely upon the uncorroborated testimony of an accomplice.

2. That the witness, John Daines, is, by his own admission and the proofs in the case, an accomplice in the offence charged.

3. That the witness, Daines, is not corroborated in any material point as to the commission by the defendant of the offence charged.

4. That the fact of being an accomplice is of itself an impeachment of the witness, Daines.

5. That no evidence of previous good character can restore the credit of an accomplice standing thus self-impeached.

6. That proof of previous good character of the accused is a sufficient defence in a doubtful case.

The court refused to charge the jury as requested, on each or either of them of the several propositions thus presented and as requested, to which several refusals of the said court, and each of them, so to charge as requested, the defendant's counsel specifically excepted.

The jury found the prisoner guilty of embezzlement, under the first count of the indictment, and not guilty as to the larceny charged in the second count.

The defendant, by his counsel, thereupon moved ‹the said court in arrest of judgment, upon the following grounds:

I. The first count of the indictment is bad for duplicity.

1. Because it contains twenty-seven different and distinct articles which might be the subject of embezzlement, enumerated as having been embezzled, and,. from their nature, impossible to have been embezzled at one and the same time; and

2. Because it contains different offences which, by statute, must receive different degrees of punishment.

II. The verdict is irregular, insufficient and uncertain.

1. Because it does not specify of which offence the defendant is convicted, nor the thing embezzled or its value; and

2. Because it does not acquit the defendant of those offences charged in the first count of which he is found guilty, or on which no verdict of guilty is found.

Coats *v.* The People.

The motion in arrest of judgment was denied by the court, to which the prisoner's counsel excepted.

The prisoner was sentenced to be imprisoned in the State Prison, at hard labor, for two years.

A bill of exceptions having been settled, the cause was removed by writ of error to this court.

The cause was argued by

*D. J. Sunderlin*, for the plaintiff in error, and

*H. M. Stewart* (District Attorney), for the People.

The Supreme Court, after advisement, decided that no error had been committed, and affirmed the judgment of the Court of Sessions.

Judgment affirmed.